## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

EDUARDO A. SAENZ, *on behalf of himself and all others similarly situated,*

Plaintiffs,                                          Civil Action No.1:18-cv-04718-JPB

v.

OLD DOMINION FREIGHT LINE, INC.,

Defendant.

## MEMORANDUM IN SUPPORT OF JOINT MOTION FOR SETTLEMENT APPROVAL

## <u>INTRODUCTION</u>

Plaintiff Eduardo Saenz, individually and on behalf of the Settlement Collective ("Plaintiffs") and Old Dominion Freight Line, Inc. ("Defendant") (together "the Parties"), have reached a proposed settlement of Plaintiffs' claims under the Fair Labor Standards Act ("FLSA").  Through this joint motion and memorandum, the Parties respectfully request that the Court approve their settlement agreement and dismiss this case with prejudice.  As detailed below, the settlement is a fair and reasonable resolution to a *bona fide* dispute between the Parties.  Plaintiffs

have been informed of the terms of the settlement and none of the 113 Plaintiffs have rejected the settlement.

## I.   LITIGATION, DISCOVERY, AND SETTLEMENT

### A. Procedural History

On October 11, 2018, Plaintiff filed this FLSA collective action on behalf of himself and all other similarly situated individuals who worked in the role of a Switcher for Defendant.  (ECF No. 1.)  Plaintiff alleged that Defendant failed to pay him and all other similarly situated employees overtime compensation for hours worked over 40 in a workweek.  (*Id.*)  Plaintiff subsequently amended his Complaint on October 26, 2018 to provide an initial estimate of damages per the Court's Order in Actions Brought under the FLSA.  (ECF No. 8.)

On October 13, 2018, Plaintiff moved for conditional certification of the following proposed FLSA collective:

> All individuals who currently work or have worked for Old Dominion on or after October 11, 2015, and were primarily engaged in moving trailers to designated loading and unloading sites on Old Dominion's premises, including (but not limited to) those individuals who were given the job title of "switcher," "yard switcher," "hostler," or "yard jockey."

(ECF No. 4.)   Shortly thereafter, on November 5, 2018, Plaintiff filed an amended motion for conditional certification.  (ECF No. 13.)  On November 8, 2018, Defendant moved for denial of Plaintiff's motion for conditional certification, arguing that the motion was premature and moot.  (ECF No. 14.) A few days later,

on November 15, 2018, Defendant brought a partial motion to dismiss, arguing that Plaintiff failed to properly plead Defendant's willful violation of the FLSA.  (ECF No. 17.)

On December 18, 2018, the Court denied Defendant's motion for denial. (ECF No. 33.)  Subsequently on January 2, 2019, the Court denied Defendant's partial motion to dismiss, finding that Plaintiff's allegations sufficiently pled willfulness, and ordered Defendant to respond to Plaintiff's motion for conditional certification.  (ECF No. 36.)  Defendant then filed its Answer on January 16, 2019. (ECF No. 40.)

On June 7, 2019, the Court granted Plaintiff's motion for conditional certification in part and denied it in part.  (ECF No. 71.)  The Court also denied Defendant's motion to strike portions of Plaintiff's reply brief.  (*Id*.)  The Court ultimately ordered that notice be issued to the following collective:

> All individuals who (1) worked for Old Dominion at any time during the period between October 11, 2015 and the pendency of this action ("the Relevant Time Period"); (2) worked full time in the job title of Switcher; (3) were primarily engaged in moving trailers to designated loading and unloading sites on Old Dominion's premises; (4) never moved trailers or drove trucks on public highways; (5) worked more than 40 hours in any workweek during the Relevant Time Period; and (6) were not paid the overtime premium (i.e., time and one-half their regular hourly rates of pay) for all hours worked over 40 in a week.

(*Id.*)  On July 9, 2019, the Parties brought a joint motion for approval of notice of lawsuit form and distribution method.  (ECF No. 77.) Subsequently, on September

5, 2019, the Court resolved the Parties' disagreements by approving the form of notice and approving notice to be sent via U.S. mail and email with a reminder notice and a 60-day opt-in period.  (ECF No. 82.)

Plaintiffs' counsel sent notice of lawsuit via U.S. mail and email on October 3, 2019 and sent a reminder notice on November 12, 2019.  (Srey Dec. ¶ 2.) 129 Plaintiffs joined this case.[1]  (*Id.*)

### B. Factual Background

The Parties have differing views on the facts in this case, but have come together to negotiate a resolution.  Plaintiffs allege that as Switchers they spent their day moving trailers to designated loading and unloading sites within Defendant's yard. (ECF No. 13 at 4.)  Plaintiffs allege that they did not operate trucks or tractors on public highways.  (*Id.*)  According to Plaintiffs, in approximately 2018, Defendant began requiring its full-time Switchers to work on the dock for two hours per day (or one day per week) in an effort to make them exempt from overtime compensation under the Motor Carrier Act ("MCA").

Defendant compensated Plaintiffs on an hourly basis.  Plaintiffs regularly worked more than 40 hours per workweek.  Defendant maintained a timekeeping system to monitor all hours worked.  While Defendant paid overtime compensation

---

[1] Sixteen (16) of the 129 Plaintiffs who joined this action have claims outside of the applicable statutory period.  Therefore, only 113 Plaintiffs are included in this settlement class.  (Srey Decl. ¶ 3.)

for hours worked over 60 per workweek, Plaintiff alleged that it uniformly misclassified Plaintiffs as exempt and only paid them straight time for all hours worked up to 60 per workweek.  Therefore, Plaintiffs sought the half-time premium for all hours worked between 40 and 60 per workweek. (ECF No. 8 at ¶ 54.)  Finally, Plaintiffs contended that Defendant's argument related to personal jurisdiction over out-of-state opt-in plaintiffs had not only been waived, but would also not succeed on the merits.

Defendant contended that it paid its Switchers properly because the Switchers were properly classified as exempt.  (ECF No. 40 at 21.)  Defendant also contended that even though the Court had conditionally certified a nationally scoped collective, there remained a question of whether the Court could exercise personal jurisdiction over any opt-in plaintiff who was not paid or harmed within Georgia or who was not a resident of the state.  *See Bristol Myers Squibb Co. v. Superior Court of Court of California, San Francisco County,* 137 S.Ct. 1773 (2017).  Defendant contended, as well, that the Court would ultimately decertify the conditionally certified collective. In other words, Defendant adamantly contested the merits of Plaintiff's claims as well as his ability to achieve a collective action judgment, if any might be had, for those who had opted into the case when the parties mediated.

**C. Discovery and Mediation Efforts**

Pursuant to the Court's Order, Defendant provided Plaintiff with time and pay records for the initial opt-in Plaintiffs.  (ECF No. 7). The Court ordered mediation within sixty (60) days after the close of the FLSA notice period.  (*Id*.)  On August 2, 2019, the Parties moved the Court to extend this deadline to within thirty (30) days after the close of the FLSA notice period.  (ECF No. 81.)  The Court granted this motion on August 5, 2019.  (ECF No. 82.)

Prior to mediation, Defendant provided Plaintiffs' Counsel with time and pay data in order to further settlement discussions.  On January 29, 2019, the Parties engaged in mediation under the Court's order with A. Lee Parks, Jr., an experienced third-party neutral.  (Srey Decl. ¶ 4.)  The Parties reached a settlement and signed a memorandum of understanding at the mediation, which was later memorialized in a Settlement and Release Agreement.  (*See* Settlement Agreement, Ex. A.)

## II.    EXPLANATION OF THE SETTLEMENT

### A. Settlement Amount and Allocation of Settlement Funds

Defendant will pay a total settlement amount of $725,000.00 ("Gross Settlement Amount"). The Gross Settlement Amount includes all amounts to all Settling Plaintiffs, attorneys' fees, expenses, and a service award to the Named Plaintiff, but excludes the full cost of the Third Party Administrator and Defendant's share of the payroll taxes, which Defendant will pay separately.  (Settlement Agreement ¶ IV.)

Plaintiffs' Counsel requests the Court to allocate a service award of $1,500.00 from the Gross Settlement Amount for the time and effort that Named Plaintiff Saenz incurred in securing the settlement in this Action.  (*Id.* ¶ IV(B)(1).)  Plaintiffs' Counsel requests that the Court also approve $241,666.67 in attorneys' fees and $5,000.00 in expenses.  (*Id.* ¶ IV(B)(5).)

## B. Allocation Formula

Defendant provided Plaintiffs' Counsel with weekly payroll data for the Opt-in Plaintiffs.  (Srey Decl. ¶ 5.)  Plaintiffs' damages model considered a three-year statutory period based on the date each Plaintiff opted into this action.  (*Id.*)  Plaintiffs' Counsel calculated each individual's hourly rate per week by dividing his/her total hours by the total pay.  (*Id.*)  If the Plaintiff's total hours were over 60, an hourly rate was determined assuming any hours over 60 were paid at time-and-a-half.  (*Id.*)  Plaintiffs calculated damages through December 27, 2018 because it is the last full workweek before the collective definition ends.  (*Id.*)  Finally, to the extent that a Plaintiff performed exempt driving work during a workweek, that workweek was excluded.  (*Id.*)

To calculate each Plaintiff's weekly unpaid overtime hours, Plaintiffs tallied each individual Plaintiff's weekly hours worked between 40 and 60 in each workweek.  (*Id.*)  The amount of weekly overtime wages owed to that Plaintiff was then calculated by multiplying the hours tally by one-half (0.5) the hourly rate. (*Id.*)

This was done for every workweek in which that Plaintiff worked as a Switcher (through December 27, 2018); then all those figures were summed to arrive at the total amount of overtime wages owed for that Plaintiff. (*Id.*) Wage loss figures were then multiplied by two to calculate that Plaintiff's liquidated overtime damages. (*Id.*) Once the total wage loss figures were determined for each Plaintiff, each Plaintiff was allocated his/her *pro rata* share of the settlement funds.  (*Id.*)

Plaintiffs' Counsel also calculated state law damages for Opt-in Plaintiffs who performed work in states with additional state law remedies beyond what is available under the FLSA.  (*Id.*)  Such states include New York (six year statute of limitations, waiting time penalties, wage statement penalties, and pre-judgment interest), Illinois (waiting time penalties), Massachusetts (treble damages), and North Carolina (pre-judgment interest).

### C. Notice of Settlement and Opportunity to Reject

On March 23, 2020, a Third-Party Administrator ("Administrator") distributed Notice of Settlement ("Notice") to Plaintiffs. (*See* Settlement Agreement ¶ II(A), Ex. A.)  The Notice explained the terms of the settlement and informed Plaintiffs of their individual settlement offer.  (*See* Notice of Settlement, Ex. B.)  The Administrator also sent W-4 forms to former employees, and W-9 forms to each Plaintiff.  (*See* Settlement Agreement ¶ II(A), Ex. A.)

Per the Notice, all Plaintiffs had thirty (30) days to accept or reject their individual settlement offer (the "Response Period") by providing a written notice of rejection to Plaintiffs' Counsel, or by doing nothing to accept.  (*Id.* at ¶ II(B).) All Plaintiffs who reject their settlement offer will forever forfeit their consent-based tolling if they do not re-file their claim within 15 days after their claims are dismissed without prejudice.  (*Id.*)  Any Plaintiff who does not cash his or her check within 90 days will be deemed to have rejected the settlement offer. (*Id.*) Any Plaintiff who rejects his or her settlement offer or who does not cash his or her check within 90 days will be considered a Rejecting Plaintiff and is not bound by the Release of Claims.  (*Id.*) Any Plaintiff who is not a Rejecting Plaintiff is a Settling Plaintiff. (*Id.*)

The settlement notice period ended on April 23, 2020. (Srey Decl. ¶ 6.) No Plaintiffs rejected their settlement offer by providing a written notice of rejection to Plaintiffs' Counsel.  (*Id.*)

### D. Released Claims

As explained in the Settlement Agreement, Settling Plaintiffs will release Defendant from:

> All claims under the FLSA and any other applicable federal, state, or local statute or common law theory for unpaid wages of any kind, as well as all related claims for any other compensation, benefits, penalties, interest, liquidated damages, damage enhancements, attorneys' fees, costs, or expenses, that are or could have been asserted in the Litigation, relating back to the full extent of the applicable

statutes of limitations under the FLSA and under any other applicable federal, state, or local statute or common law theory giving rise to any such claim, through January 29, 2020, with prejudice.

(Settlement Agreement ¶ VII(A).)[2]

## ARGUMENT

## I.  THE COURT SHOULD APPROVE THE FLSA SETTLEMENT AS FAIR AND REASONABLE

The Parties have reached a settlement agreement, and notice of the settlement has been distributed to the Plaintiffs. The settlement fairly and reasonably resolves the Parties' claims and defenses, and the Court should enter an order granting final approval of the settlement.

### A. Legal Standard

A settlement resolving claims under the FLSA must be approved by the court. 29 U.S.C. § 216(b); *Wingrove v. D.A. Techs., Inc.*, No. 1:10-CV-3227-HLM-WEJ, 2011 WL 7307626, at *1 (N.D. Ga. Feb. 11, 2011) (citing *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1352 (11th Cir. 1982)). The FLSA's pay requirements are mandatory and, except in two narrow circumstances, employees' rights under the FLSA are generally not subject to waiver by contract or settlement. *Lynn's Food Stores,* 679 F.2d at 1352. One such circumstance, like in the present

---

[2] The release includes Defendant and its parent, subsidiaries, affiliates, divisions, business units, members, shareholders, and its and their predecessors, successors, officers, directors, agents, employees, and assigns.

matter, is when a court reviews and approves a settlement in a private action for back wages. *Wingrove*, 2011 WL 7307626, at *1 (citing *Lynn's Food Stores*, 679 F.2d at 135).

In approving an FLSA settlement, the Court must ensure that there is a fair and reasonable resolution of a *bona fide* dispute. *Lynn's Food Stores*, 679 F.2d at 1354–55 (explaining that FLSA settlements must "reflect a reasonable compromise of disputed issues [rather] than a mere waiver of statutory rights brought about by an employer's overreaching."). The Eleventh Circuit has detailed the circumstances that justify court approval of an FLSA settlement in a litigation context as follows:

> Settlements may be permissible in the context of a suit brought by employees under the FLSA for back wages because initiation of the action by the employees provides some assurance of an adversarial context. The employees are likely to be represented by an attorney who can protect their rights under the statute. Thus, when the parties submit a settlement to the court for approval, the settlement is more likely to reflect a reasonable compromise of disputed issues than a mere waiver of statutory rights brought by an employer's overreaching. If a settlement in an employee FLSA suit does reflect a reasonable compromise over issues, such as FLSA coverage or computation of back wages that are actually in dispute, we allow the district court to approve the settlement in order to promote the policy of encouraging settlement of litigation.

*Id.* at 1354. The decision to approve settlement of an FLSA collective action lies within the trial court's discretion. *Id.* at 1350.

In determining whether FLSA settlements are fair and reasonable, district courts also look to "fairness" factors derived from Rule 23 class actions including:

(1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of the plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of class counsel, class representatives, and the substance and amount of opposition to the settlement. *George v. Academy Mort'g Corp.*, 369 F. Supp. 3d 1356, 1369 (N.D. Ga. 2019) (citing *Leverso v. SouthTrust Bank*, 18 F.3d 1527, 1530 (11th Cir. 1994)); *see also Prieto v. Scheeler's Cafe De Marco, Inc.*, 2:16-cv-139-FTM-99CM, 2017 WL 359220, at *1 (M.D. Fla. Jan. 9, 2017) (same).  There is a strong policy and presumption in favor of settlement agreements, and they are a preferred method of resolving class actions. *George*, 369 F. Supp. 3d  at 1367; *see also Murchison v. Grand Cypress Hotel Corp.*, 13 F.3d 1483, 1486 (11th Cir. 1994) (noting that the Eleventh Circuit Court of Appeals "favor[s] and encourage[s] settlements in order to conserve judicial resources").

### B. This FLSA Settlement Is a Compromise of a *Bona Fide* Dispute.

Courts approve FLSA settlements when they are reached as a result of contested litigation to resolve *bona fide* disputes.  *See Lynn's Food Stores*, 679 F.2d at 1353 n.8.  A *bona fide* dispute exists where an employee made a claim that he or she was not properly paid, defendant denied those allegations, and the settlement reflected a reasonable compromise over the issues.  *See Reams v. Michael Angelo Rest., Inc.*, 19-cv-53-HL, 2019 WL 6898656, at *2–3 (M.D. Ga. Dec. 18, 2019).

Here, the settlement is a compromise over numerous *bona fide* issues, warranting approval. Plaintiffs alleged that Defendant improperly denied them overtime compensation by misclassifying Switchers as exempt from the FLSA's overtime protections and improperly paying straight time, rather than the overtime premium, for hours worked between 40 and 60 per workweek. Defendant vehemently denies these allegations, argues that Plaintiffs were properly compensated under the MCA, and contends that the conditionally certified collective would – for various reasons -- never make it to judgment if the case did not settle. The Parties also have opposing views on damages components such as liquidated damages and whether a three-year statute of limitations period applies.

Although both Parties continue to firmly believe in the merits of their respective claims and defenses, given the time and expense associated with continued litigation, and the uncertainty of dispositive motion practice and trial, the Parties reached a settlement after an arm's-length negotiation. They desire to resolve this case by way of a negotiated settlement payment by Defendant in exchange for a release of claims by Settling Plaintiffs in order to avoid the time and expense inherent in continued litigation. Accordingly, this matter is indeed a *bona fide* dispute between the Parties.

**C. The FLSA Settlement Is Fair and Reasonable.**

At the core of *Lynn's Food* is the concept that FLSA settlements must "reflect a reasonable compromise of disputed issues [rather] than a mere waiver of statutory rights brought about by an employer's overreaching." *Lynn's Food Stores*, 679 F.2d at 1354.[3]  Here, an analysis of the six Rule 23 "fairness" factors listed above demonstrates that this settlement is fair and reasonable.

### 1.  The Risk of Fraud or Collusion

A district court may presume no fraud or collusion occurred between counsel when there is no evidence to the contrary.  *See Collins v. Sanderson Farms, Inc.*, 568 F. Supp. 2d 714, 722 (E.D. La. 2008).  Here, the settlement was the result of intensive, arm's length negotiations between attorneys who have extensive class and collective action wage-and-hour litigation experience and who have knowledge of the legal and factual issues in this case.  The Parties' respective counsel is experienced in the litigation, certification, trial, and settlement of wage-and-hour cases, including nationwide class and collective actions similar to this case.  The settlement in this case was reached only after significant motion practice leading up to conditional certification.  There has been no collusion among the Parties.  The Parties engaged in a successful mediation conducted by a qualified mediator, A. Lee Parks, Jr., which culminated in this settlement.  *See George*, 369 F. Supp. 3d at 1370

---

[3] *Lynn's Foods* involved an employer who abandoned its negotiations with the Department of Labor and on its own convinced fourteen employees to split a $1,000 settlement amount in exchange for a release of over $10,000 in claims.  *Id.* at 1352.

(stating that the Parties settling the action through mediation with an experienced mediator further "confirm[ed] that the process was procedurally sound and not collusive"). This factor therefore supports approval of the settlement.

### 2.  The Complexity, Expense, and Likely Duration of the Litigation

The Parties agree that the settlement represents a good value given the risks of continued litigation.  If the litigation were to continue, the Parties would need to engage in significant discovery.  Plaintiffs would face a number of high-stakes risks before trial that could have limited or even eliminated their claims, including possible decertification and dispositive motions on liability, liquidated damages, and willfulness.  Because many of the contested issues are fact-intensive, it is very possible the case would not be resolved on summary judgment, meaning liability and damages would be resolved at trial. Wage and hour trials are complex, expensive, and unpredictable. Absent this settlement, payment for Plaintiffs would have been uncertain and would have taken much longer. Such expense and complexity favor approval of the settlement.

### 3.  The Stage of the Proceedings and the Amount of Discovery Completed

While formal discovery had not begun when the settlement was reached, the proceedings had advanced to a stage sufficient to permit the Parties and their experienced counsel to collect, obtain, and review evidence, evaluate their claims and defenses, understand the scope of potential damages by analyzing Defendant's

payroll data, and engage in negotiations with the mutual understanding that continuing toward additional formal discovery and completing dispositive motion practice (including decertification) would be a difficult, costly and uncertain undertaking. *See Lunsford v. Woodforest Nat'l Bank*, No. 1:12-CV-103-CAP, 2014 WL 12740375, at *8 (N.D. Ga. May 19, 2014) (explaining that because the law encourages early settlements, only some reasonable amount of discovery should be required to make a determination of reasonableness). Plaintiffs' Counsel's analysis of Defendant's payroll records and their investigation of Plaintiffs' claims, along with their experience in litigating wage and hour cases, support the finding that the settlement is fair and reasonable.

### 4. The Probability of Plaintiffs' Success on the Merits

Plaintiffs believe that if litigation were to continue, they may prevail on their claims. However, Defendant disputes liability and contends that Plaintiffs were properly compensated for all of their hours worked. *See Hirsch v. Mister Sparky, Inc.*, No. 9-CV-2897-TWT, 2010 WL 11603091, at *3 (N.D. Ga. Oct. 19, 2010) (finding that where defendant denied plaintiff's allegations and raised defenses, plaintiff's probability of success was uncertain). Beyond the issue of liability, derivative issues also present challenges. For example, Plaintiffs believe there is evidence that despite being put on notice that overtime pay was an issue, Defendant took no action. However, even at trial, Plaintiffs will face complications in proving

these violations were willful and in bad faith.  Given the risks and delay inherent in litigation, this factor supports approval of the settlement.

### 5.  *The Range of Possible Recovery*

In determining the potential range of recovery, the Court should be guided by the principle that "the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate." *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990). Here, each Settling Plaintiff is receiving, on average, 92.4% of their unpaid FLSA overtime damages.  This factor therefore supports approval of the settlement.

### 6.  *The Opinions of Class Counsel, Class Representatives, and the Substance and Amount of Opposition to the Settlement*

Plaintiffs' Counsel is a qualified firm with extensive experience in class action and wage and hour litigation.  The Nichols Kaster Firm ("Nichols Kaster") has been in existence for over thirty years and is focused on advocating for employee and consumer rights.  (Srey Decl. ¶ 7; *see also* Nicholas Kaster Firm Resume, Ex. E.) Nichols Kaster has represented thousands of employees in hundreds of cases and was recently named the Employment Rights Firm of the year for 2019 by the National Trial Lawyers/National Law Journal.  (*Id.*)  Plaintiffs were also represented by Smith Law, LLC. Located in Gwinnett County, Georgia, Smith Law, LLC has litigated numerous employment, wage and hour, and civil rights cases in federal

courts throughout Georgia since 2012, and has settled several FLSA collective actions (including *Walters v. Intec Communications, LLC, et al.*, ND Ga. No. 1:15-cv-02673-ELR, which involved 900 putative class members and 265 opt-ins from 6 locations across the country). (Smith Decl. ¶ 6.) Counsel agrees that the settlement is fundamentally fair, adequate, and reasonable. This settlement agreement is the result of arms-length negotiations between experienced counsel representing the interests of Plaintiffs and Defendant, facilitated by a skilled mediator, after thorough factual and legal investigations. Each of the Named and Opt-in Plaintiffs was given the opportunity to reject the settlement offer in writing, and no Plaintiff has rejected this settlement. This factor supports approval of the settlement.

Accordingly, for all of the reasons detailed above, this settlement should be approved.

## II. THE COURT SHOULD APPROVE THE NAMED PLAINTIFF SERVICE AWARD

A service award serves to compensate a named plaintiff for the services they provided and the risks they incurred during the litigation. *See Lunsford v. Woodforest Nat'l Bank*, No. 1:12-cv-103-CAP, 2014 WL 12740375, at *10 (N.D. Ga. May 19, 2014). "Courts have consistently found service awards to be an efficient and productive way to encourage members of a class to become class representatives." *George*, 369 F. Supp. 3d at 1374. District courts consider the following factors in approving service awards: (1) the actions the class

18

representatives took to protect the interest of the class; (2) the degree to which the class benefitted from those actions; and (3) the amount of time and effort the class representatives expended in pursuing the litigation.  *See Lunsford*, 2014 WL 12740375, at *10.

As part of the Settlement Agreement, the Parties agreed to a service award of $1,500 for the Named Plaintiff.  (Settlement Agreement ¶ IV.B.1, Ex. A.)  The service award appropriately compensates Named Plaintiff Saenz for his time and effort protecting the interests of the collective and contributing to the litigation. Named Plaintiff Saenz contributed to the case by initiating the litigation, providing documents and information related to the claims, responding to Plaintiffs' Counsel's questions, providing a declaration in support of conditional certification, and attending an all-day mediation. (Srey Decl. ¶ 8.) The Named Plaintiff's efforts were integral to developing the theory of the case and providing information throughout the litigation and at mediation, which benefitted the collective in securing this fair and reasonable settlement.  (*Id.*)

In addition to the Named Plaintiff's efforts in the litigation, the requested service award is also reasonable given the size of the collective's recovery.  The award does not significantly reduce the amount of settlement funds available to the remaining Plaintiffs and only represents approximately 0.3% of the allocated funds to the Settling Plaintiffs.  (Srey Decl. ¶ 9.)  This award is also significantly less than

those approved by courts within this Circuit and in similar cases. S*ee, e.g.*, *George*, 369 F. Supp. 3d at 1374 (approving a service award of $7,500 to the named plaintiff where the class award was $925,000); *Williams v. Omainsky*, No. CV 15-0123-WS-N, 2017 WL 390272, at *5 (S.D. Ala. Jan. 27, 2017) (awarding $5,000 to each Named Plaintiff where the damages payment totaled $399,238.35); *Reyes v. AT&T Mobility Servs., LLC*, No. 10-20837-CV, 2013 WL 12219252, at *3 (S.D. Fla. June 21, 2013) (awarding $10,000 in service payments to multiple representatives where the class award was $3,287,500.00).   As such, the requested service award is reasonable and should be approved.

## III.   PLAINTIFFS' COUNSEL'S REQUESTED AWARD OF ATTORNEYS' FEES AND COSTS IS REASONABLE AND SHOULD BE GRANTED

### A. Attorneys' Fees Were Negotiated Separately from the Plaintiffs' Claims

In the Eleventh Circuit, a district court need not separately consider the reasonableness of requested attorneys' fees if the settlement (1) constitutes a compromise of the plaintiff's claims, (2) makes full and adequate disclosure of the terms of settlement, including the factors and reasons considered in reaching same and justifying the compromise of the plaintiff's claims, and (3) represents that the plaintiff's attorneys' fee was agreed upon separately and without regard to the amount paid to the plaintiff, unless the settlement does not appear reasonable on its face or there is reason to believe that the plaintiff's recovery was adversely affected by the amount of fees paid to his attorney.  *Bonetti v. Embarq Mgmt. Co.*, 715 F.

20

Supp. 2d 1222, 1228 (M.D. Fla. 2009).  Here, the first two factors have been met as described above.   Under factor three, the attorneys' fees and costs allocated to Plaintiffs' Counsel was negotiated separately and without regard to the amount Defendant has agreed to pay Plaintiffs.  As such, the recovery by Plaintiffs was not adversely affected by the amount of the attorneys' fees and costs paid to their counsel.   Moreover, the Notice distributed to Plaintiffs specified the dollar amount that Plaintiffs' Counsel would be seeking in its request for attorneys' fees and costs, and no Plaintiff objected.  (Srey Decl. ¶ 10.)  Therefore, the Court should grant Plaintiffs' Counsel's requested attorneys' fees

### B.  The Requested Fees Are Also Reasonable under the Lodestar Crosscheck

Courts may also apply a lodestar crosscheck to confirm that the requested attorneys' fees are reasonable.  *See, e.g.*, *Heath v. Hard Rock Cafe Int'l (STP), Inc.*, 2011 WL 5877506, at *3 (M.S. Fla. Oct. 28, 2011) (cross-checking plaintiffs' counsel's lodestar and determining that attorneys were receiving less fees than their lodestar).   To calculate the lodestar, the court considers the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).

Here, the lodestar crosscheck supports the requested attorneys' fees as reasonable.  Plaintiffs' Counsel has expended approximately $264,657.5 and 780.3 hours in litigating and resolving this case.  A summary chart that breaks down each

attorney's and staff member's hourly rate and time spent on this case is attached hereto as Exhibit C.[4]  In light of the significant motion practice early in this matter and Plaintiffs' Counsel's regular communications with Plaintiffs, the time and expenditure on this case is reasonable.  Moreover, because the amount expended on this matter exceeds Plaintiffs' Counsel's requested fees, the Court should grant their request.  *See Warner v. Complete Cash Holdings, LLC*, 2011 WL 13161934, at *3 (N.D. Ga. Mar. 24, 2011) (finding that where the requested attorneys' fees exceeded the amount calculated under the traditional lodestar method, the requested fees were reasonable).

As detailed *supra* in Section I.B.6, Plaintiffs' Counsel's experience supports the hourly rates billed by Plaintiffs' Counsel and their staff.  The hourly fee rate and number of hours expended by each attorney is provided at Exhibit C.  *See generally George v. Acad. Mortg. Corp.*, 369 F. Supp. 3d 1356 (N.D. Ga. 2019) (approving attorneys' fees supported by a fee declaration showing hourly rates of up to $575); *Willoughby v. Youth Villages, Inc.*, 2016 WL 7013537, at *2 (N.D. Ga. Nov. 30, 2016) (concluding that an hourly rate of $400 for lead counsel was reasonable); *Butz v. Amware Distrib. Warehouses of Georgia, Inc.*, 2014 WL 6908393, at *2 (N.D. Ga. Dec. 8, 2014) (finding that hourly rates up to $425 were reasonable).

---

[4] Plaintiffs' Counsel can submit detailed billable hours for each attorney and staff member if necessary.

### C. The Court Should Also Grant Plaintiffs' Counsel's Expenses

In addition to the attorneys' fees, Plaintiffs' Counsel also seeks $5,000.00 as reimbursement for out-of-pocket costs incurred in litigation expenses, which counsel advanced with the risk of no recovery.  (Srey Decl. ¶ 11.)  Those costs include filing fees, research charges, travel costs, mediation fees, and correspondence with clients.  (*See* Summary of Costs, Ex. D.)  Plaintiffs' Counsel incurred these costs on behalf of Plaintiffs, and Defendant does not oppose this request for reimbursement of expenses.

Based on their significant experience with FLSA collective matters, Plaintiffs' Counsel represents that this a fair and reasonable settlement.  Moreover, Defendant does not oppose Plaintiffs' Counsel's application for approval of attorneys' fees and litigation costs. Accordingly, the Court should approve the requested fees and costs.

<u>**CONCLUSION**</u>

This settlement is the product of extensive arm's-length negotiation between counsel, which fairly and reasonably resolves a *bona fide* dispute over unpaid overtime wages.  The proposed Settlement Agreement and Plaintiffs' attorneys' fees satisfy the criteria set by the Eleventh Circuit.  For these reasons and those set forth above, the Parties jointly and respectfully request that this Court approve the Parties' Settlement Agreement and dismiss this action with prejudice.

Dated: May 7, 2020

**NICHOLS KASTER, PLLP**

/s/Rachhana T. Srey
Rachhana T. Srey*
Minnesota Bar No. 0340133
srey@nka.com
Caroline E. Bressman*
Minnesota Bar No. 0400013
cbressman@nka.com
80 S. 8th Street
Minneapolis, MN 55402
T: (612) 256-3200
F: (612) 215-6870

*Admitted pro hac vice

**SMITH LAW, LLC**

/s/ Louise N. Smith
Louise N. Smith
Georgia Bar No. 131876
louise@smithlaw-llc.com
William J. Smith
Georgia Bar No. 710280
william@smithlaw-llc.com
3611 Braselton Highway
Suite 202
Dacula, GA 30019
T: (678) 889-2898
F: (844) 828-5615

Attorneys for Named Plaintiff
and the Collective Class

Respectfully submitted,

**SEYFARTH SHAW, LLP**

/s/Brett C. Bartlett
Brett C. Bartlett
Georgia Bar No. 040510
bbartlett@seyfarth.com
Katherine M. Smallwood
Georgia Bar No. 68979
ksmallwood@seyfarth.com
Ariel D. Fenster
Georgia Bar No. 420858
afenster@seyfarth.com
1075 Peachtree St., N.E.,
Ste. 2500
Atlanta, GA 30309-3958
T: (404) 885-1500
F: (404) 892-7056

Counsel for Defendant

## **FONT AND POINT CERTIFICATION**

The undersigned counsel hereby certifies that the within and foregoing document was prepared using Times New Roman, 14-point font in accordance with LR 5.1(B).

This 7th day of May, 2020.

By:   /s/ Rachhana T. Srey
      Rachhana T. Srey, MN Bar No. 340133*